AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| United States of America | ) |
|---|---|
| v. | ) |
| LUIS DELPINO, | ) |
| ALON GARCIA, | ) Case No. 19-6470-Hunt |
| CHRISTOPHER ESPINOSA, | ) |
| MIGUEL ROCQUE NUNES, | ) |
| JONAEL MONS, AND | ) |
| ALEX SANCHEZ, | ) |
| Defendant(s) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   May 2016 through September 2019   in the county of   Broward and elsewhere   in the Southern District of   Florida  , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 21, United States Code, Section 846 | Conspiracy to Distribute a Controlled Substance to wit: marijuana and/or anabolic steroids |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
Complainant's signature

TFO James White, HSI
_____
Printed name and title

Sworn to before me and signed in my presence.

Date:  10/1/19

_____
Judge's signature

City and state:   Fort Lauderdale, Florida      PATRICK M. HUNT, U.S. MAGISTRATE JUDGE
_____
Printed name and title

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

Your affiant, James White, being duly sworn, does depose and state the following:

1. I am employed as a Task Force Officer (TFO) of the United States Department of Homeland Security, Homeland Security Investigations (HSI). I have been employed as a TFO with HSI since April of 2015. I am currently assigned to investigate drug trafficking in Fort Lauderdale, Florida, and the surrounding areas. In addition, I am currently a detective with the Broward Sheriff's Office (BSO) in the Strategic Investigations Division. I have been employed by BSO since April of 2000.

2. During the course of my law enforcement career, I have participated in thousands of investigations involving the distribution of controlled substances. I have also participated in search and seizure warrants for controlled substances and the records, books, and proceeds derived as a result of this unlawful activity and have testified in state and federal court on numerous occasions concerning the illegal sale and distribution of controlled substances. I have received training about and have participated in the documentation, identification, investigation, and the prosecution of narcotics trafficking organizations, and in the methods employed by such organizations to smuggle and distribute controlled substances. I have also communicated with other federal, state, and local law enforcement personnel who specialize in this area. Finally, I have debriefed dozens of defendants who have had personal participation and knowledge of these illicit activities.

3. This affidavit is submitted in support of a criminal complaint charging Christopher ESPINOSA, Luis Eduardo DEL PINO, Alon Justin GARCIA, Jonael MONS, Miguel ROQUE-NUNEZ, and Alex SANCHEZ with conspiracy to distribute controlled a substance to wit: anabolic steroids and more than 50 kilograms of a mixture and substance containing a detectable amount of

marijuana, in violation of Title 21, United States Code, Sections 841 and 846. The facts contained herein are based on my personal knowledge or knowledge provided to me by other law enforcement agents or other credible sources of information. The information contained in this affidavit is submitted for the limited purpose of establishing probable cause for the issuance of a criminal complaint and arrest warrants against ESPINOSA, DEL PINO, GARCIA, MONS, ROQUE-NUNEZ, and SANCHEZ, it does not contain all the facts known to me and other investigators regarding this investigation.

4. On May 5, 2018, the Broward Sheriff's Office (BSO), Narcotics Interdiction Task Force conducted a parcel interdiction operation at the FedEx facility in Miramar, FL. During the operation, law enforcement observed six parcels that displayed characteristics common with parcels that contain and transport narcotics. A BSO Narcotics Canine was deployed to the six parcels and alerted to all of them for the presence of odor of a controlled substance that the Narcotics Canine is trained to detect. State of Florida search warrants were obtained for each parcel. Upon the execution of the search warrants, each parcel was found to contain a bulk amount of marijuana. In total, the six parcels contained approximately 162 pounds of marijuana. Of the six parcels that were seized, four of the parcels were addressed to postal boxes at UPS Stores located in Broward and Miami-Dade counties. Law enforcement responded to several of the UPS Stores and determined the accounts related to the parcels were opened using counterfeit Florida driver's licenses and counterfeit vehicle insurance cards. Although each counterfeit driver's license contained a different name, the same two subjects' photos were utilized on the counterfeit driver's licenses. Using the photographs and other investigative techniques, law enforcement officers were able to identify the individuals who opened the account. One was identified as Christopher ESPINOSA.

5. Analysis of records supplied by FedEx revealed, that within a two-year period, approximately 1,741 parcels were shipped via FedEx from the MailMax at 5111 Telegraph Avenue, Oakland, CA to addresses throughout South Florida. The combined weight of the aforementioned parcels was approximately 30,062 pounds. The majority of the parcels were shipped to fictitious names, UPS Stores, and apartment buildings with no listed apartment numbers, etc. In my training and experience, I have learned that narcotics traffickers frequently ship bulk narcotics containing fictitious shipping label information in an attempt to elude law enforcement. Between April 3, 2018 and May 4, 2018, six parcels weighing a total of 171 pounds were shipped from MailMax in Oakland, CA to two UPS store accounts opened by ESPINOSA under a false name. This total includes two of the parcels seized by law enforcement on May 5, 2018, which contained approximately 65 lbs. (approximately 29.5 kilograms) of marijuana. In addition to the domestic parcels shipped to fictitious accounts opened by ESPINOSA, a number of international parcels were shipped to those accounts as well. After the May 5th seizure, several international parcels were delivered to UPS Store accounts opened by ESPINOSA but not picked up. One parcel had been shipped from Turkey to "Robiel Castillo" at 15757 Pines Boulevard, #711, Pembroke Pines, FL. Another had been shipped from Hong Kong to "Enrique Alarcone" at 8004 NW 154th Street, #598, Miami, FL. Officers obtained copies of the counterfeit driver's licenses used to apply for the postal boxes at the respective UPS store locations. Each bore the same photograph of ESPINOSA, one bore the name "Robiel Castillo" and the other "Enrique Alarcone." United States Postal Inspectors responded to both addresses and took custody of the aforementioned parcels. A federal search warrant was obtained and executed on both parcels. The parcel addressed to "Robiel Castillo" was found to contain 30-40 bottles of Dostinex, a medication used to treat hormone imbalance. The parcel addressed to "Enrique Alarcone" was found to contain

approximately 20 boxes of human growth hormone. Additionally, law enforcement identified an additional parcel addressed to one of ESPINOSA's fictitious accounts. The parcel, also addressed to "Robiel Castillo" at 15757 Pines Boulevard, #711, Pembroke Pines, FL, had been shipped from Walnut, California and was delivered by FedEx. UPS Store staff determined the parcel had been abandoned and requested it be returned to the FedEx facility. Once the parcel arrived at the FedEx facility, it was opened by FedEx Security in accordance with their corporate policies and procedures to ensure no illegal contraband was being shipped through their facility. Upon opening the parcel, FedEx Security found a bag of an unknown powder. FedEx Security immediately contacted law enforcement who took custody of the parcel and tested the contents. A BSO chemist determined the parcel contained 749.41 grams of testosterone cypionate, a Schedule III controlled substance.

6. On July 11, 2018, law enforcement officers established surveillance at the at 6280 NW 173rd Street, #1209, Hialeah, FL. Officers observed ESPINOSA leaving the residence and conducting hand-to-hand transactions with multiple subjects in nearby parking lots during which Espinosa received United States currency. Surveillance operations over several dates established the location as ESPINOSA's residence.

7. On September 10, 2018, ESPINOSA and a woman who has been identified by law enforcement were observed entering six different grocery stores where they both purchased money orders. One of the stores was a Publix located at 18496 NW 67th Avenue, Hialeah, FL. Immediately after ESPINOSA and the woman left the Publix, officers conducting surveillance entered the store and made contact with employees who advised they asked ESPINOSA if he and the woman knew one another and that ESPINOSA said they did not. Per store employees, government issued identification is required once a total of $3,000 in money orders is purchased.

This threshold is applicable to one purchaser or when store employees believe two or more associated persons are conducting transactions. In that one day, ESPINOSA and the woman purchased money orders totaling approximately $26,000. Later that evening, ESPINOSA was dropped off at Fort Lauderdale/Hollywood International Airport where he met with Alon GARCIA. Both ESPINOSA and GARCIA then boarded JetBlue flight 277 to San Francisco, CA.

8. ESPINOSA and the same woman who accompanied him on September 10 were also observed purchasing numerous Western Union money orders from four stores in the Miami, FL area on November 6, 2018. The total value of those money orders was approximately $20,000.

9. On September 12, 2018, law enforcement officers learned that three parcels shipped from the Mail Max in Oakland, California were en route to UPS stores in Miami-Dade County. The parcels shared several characteristics with the ones seized on May 5, 2018. They had been dropped off at the shipping facility at the same time, were all addressed to UPS stores in Miami-Dade County, were all Priority Overnight delivery, and the shipping had been paid in cash.

10. On September 13, 2018, members of BSO, HSI, and the Drug Enforcement Administration (DEA) established surveillance at the three UPS stores the incoming parcels were destined for. A Hispanic male, later identified as Jonael MONS, was seen retrieving parcels from two of the UPS stores. As MONS drove toward the third UPS store, Pinecrest Police Department officers conducted a traffic stop on his vehicle for violation of Florida state statutes. Upon approaching the vehicle, officers detected a strong odor of marijuana emanating from its. MONS, the driver and sole occupant, gave verbal consent to search the vehicle. A canine search of the vehicle yielded positive alerts on the money in the center console as well as several parcels in the back seat. In the vehicle, officers discovered ten counterfeit driver's licenses in different names but bearing MONS' picture, ten counterfeit vehicle insurance cards, $7,256 in United States

currency, and six cellular telephones. Three unopened mail parcels, two large boxes and one smaller box, were recovered from the back seat of MONS' vehicle. The two large boxes, showing an origination location of the Mail Max in Oakland, California, contained a total of 40.25 lbs. (approximately 18 kilograms) of marijuana. Both were addressed to names found on the fraudulent identification cards found in the vehicle. The smaller box originated in South Korea and after testing by a DEA chemist was determined to contain 1.5 kilograms of powdered testosterone cypionate, an anabolic steroid and Schedule III controlled substance. This box was addressed to another name that appeared on one of the fraudulent licenses located in MONS' vehicle.

11. A cell phone found immediately adjacent to the gearshift had a GPS application in operation and showing on the lock screen. The destination of the GPS was the UPS Store located at 11767 South Dixie Hwy, Miami, Florida 33156, which is in the parking lot immediately adjacent to the traffic stop. Investigators responded to the UPS Store and discovered a box, addressed to a name on another of the fraudulent IDs in Mon's vehicle. Canine was again deployed and yielded a positive alert to the box located within the UPS Store. A search warrant for that parcel was obtained and executed yielding approximately 30 lbs. (approximately 13 kilograms) of marijuana.

12. A total of six Apple iPhones were located inside of MONS' vehicle at the time of his arrest. A federal search warrant was obtained for the phones.

13. Your affiant analyzed the contents of the phones. Two of the seized phones contained numerous text message communications between MONS, GARCIA, ESPINOSA, DEL PINO, ROQUE-NUNEZ, and SANCHEZ. Several of these conversations detailed the transfer of narcotics proceeds using false identities, the receipt of illicit funds, and the shipment/receiving of parcels containing narcotics.

14. During the review of MONS' phones, officers observed several messages in which

co-conspirators discussed having a "main" phone and other phones on which they discussed business. In my training and experience, pre-paid phones that require no identification to open the account are often used to facilitate criminal activity, as an individual can provide an alias to the cellular phone provider in order to mask their identity.

15. Subscriber information, queries of phone numbers through a number of databases such as LexisNexis, the content of text message conversations, and the names under which MONS saved the phone numbers in his phones, assisted investigators in determining which individuals used each phone number. In several instances, DTO members would refer to one another by name or initial, send GPS locations to their residences, provide geographical directions to their home address, or list their home addresses. This information in conjunction with flight records, financial records, and surveillance results was used to identify which members of the DTO utilized which phone numbers.

16. One of the iPhones seized from MONS contained a text message thread between MONS, ESPINOSA, and DEL PINO beginning on June 25, 2018. DEL PINO sent MONS a screenshot of an email from an individual in China containing nine names and a Chinese address. DEL PINO tells MONS to send $1,900 to each name. In a separate text thread between MONS and DEL PINO, DEL PINO instructs MONS to send DEL PINO a text once the transactions are completed and indicated the text should include the transaction number, the amount sent, and the name MONS lists as the sender. MONS later sends DEL PINO transaction information for all nine payments made via Western Union. (The names listed as senders of the nine payments were names on counterfeit driver's licenses later found in MONS' possession.) Your affiant performed an internet search for the Chinese address from the above mentioned email. The search results linked that address to Zhuhai Yuancheng Pharmaceutical & Chemical Co., which specializes in

manufacturing and exporting pharmaceutical chemicals including anabolic steroids.

17. Another of the iPhones, contained a text message conversation from July 25, 2018 and July 26, 2018 between MONS, an individual listed in the phone's contacts as "Big Lu," and an individual using cell phone number (786) 357-9238. Subscriber information identified Alex SANCHEZ as the subscriber to (786) 357-9238. A query of investigative databases provided 712 Bonneau Court, Patterson, California, 95363 as a possible address for SANCHEZ. Using the techniques referenced above, "Big Lu" was identified as DEL PINO. During the conversation, the three participants discuss using false names to send SANCHEZ money via wire transfer. During the conversation, SANCHEZ advises that several aliases he used to receive wired funds had been "flagged" and requested a new "10 pack" from DEL PINO. In your affiant's training and experience, "10 pack" refers to ten counterfeit forms of identification.

18. Messages and screenshots of receipts retrieved from the phones show that between June 25, 2018 and September 13, 2018, under the direction of DEL PINO, MONS conducted 260 financial transactions in which he sent or received a total of $198,599. Of those transactions, $110,392 were outbound payments to California, China, and Ukraine. The dates of outbound payments to California correspond with parcel shipments from California to South Florida, including parcels that have been interdicted and found to contain marijuana. The contents of emails indicate the outbound payments to China and Ukraine were for the purchase of chemicals used to manufacture steroids. The remaining $88,207 were inbound payments from customers for steroid shipments organized by DEL PINO and an unidentified associate.

19. On July 23, 2018, DEL PINO instructed MONS, via text message, to meet with and collect cash payments from two subjects. MONS later advised DEL PINO that he collected a total of $6,190 from the two subjects. DEL PINO then requested the ten names on MONS' counterfeit

driver's licenses. DEL PINO and SANCHEZ instructed MONS to send money orders to California and provided him with names for the purported recipients. SANCHEZ and DEL PINO later confirmed the funds had been received in California. Through airline and financial records, agents verified that DEL PINO, ROQUE-NUNEZ, and ESPINOSA were in California at the time of this conversation. DEL PINO also instructed MONS to retrieve DEL PINO's iPad from his residence and ship it to SANCHEZ' home address in Patterson, CA. On the same date, ESPINOSA requested MONS respond to an address to collect a cash payment from a subject that has been identified by law enforcement. Upon MONS' receipt of the money, ESPINOSA instructed him to send $2,500 to a fictitious identity in California. MONS sent a text message to ESPINOSA confirming the money was sent. On July 25, 2018 and July 26, 2018, DEL PINO sends photographs of eight shipping receipts containing a total of eight parcels shipped from MailMax in Oakland, CA. The eight parcels had a combined weight of 171 pounds and were addressed to UPS Stores throughout South Florida. All eight were addressed to names located on the counterfeit driver's licenses seized during MONS' arrest. DEL PINO went on to advise MONS which parcels belonged to DEL PINO, to ROQUE-NUNEZ, and to ESPINOSA. On July 26, and July 27, 2018, MONS sent messages to DEL PINO, ROQUE-NUNEZ, and ESPINOSA confirming he had picked up all of the parcels.

20. ROQUE-NUNEZ actively participated in a number of text message conversations located in MONS' phones, including inquiring about when boxes will be delivered, who will pick them up, and who the contents of each box belongs to. On August 14, 2018, in a text message conversation that included ROQUE-NUNEZ, DEL PINO, and ESPINOSA, MONS sent a photo of a box shipped from Hong Kong that was partially opened and severely damaged. After, expressing surprise at the box's condition, ROQUE-NUNEZ wrote, "Check for trackers."

21. On September 13, 2018, DEL PINO sent MONS a photograph of receipts for three

large parcels shipped from MailMax in Oakland, CA on September 12 to three UPS stores in South Florida. The receipts showed the shipper paid $1,775.03 in cash for overnight delivery of the parcels. On the morning of September 13, law enforcement officers established surveillance of the three UPS stores to which the parcels were addressed. Later that day, via text message, MONS and DEL PINO discussed the boxes having arrived and being ready for pick up. Shortly thereafter, law officers observed MONS picking up parcels. MONS advised DEL PINO that he would drive to DEL PINO's home. DEL PINO told MONS to meet with GARCIA first. MONS immediately messaged GARCIA and asked where he was located. GARCIA responded by sending the GPS coordinates for 9000 NW 149th Terrace, Miami Lakes, FL, which officers had confirmed through surveillance as GARCIA's residence. MONS told GARCIA that his home was too far and asked to meet him at another address. GARCIA advised MONS that he could not drive since his car's tag was expired. MONS wrote, "So your [sic] practically on house arrest." GARCIA replied, "I'll drive, just not wit [sic] work." Based on my training and experience, in this context, your affiant understands "work" to mean narcotics. Shortly thereafter, MONS agreed to drive to GARCIA's residence. Approximately three minutes after this message, MONS was stopped by law enforcement and subsequently arrested.

22. On the evening of September 13, 2018, law enforcement officers observed DEL PINO, ESPINOSA, ROQUE-NUNEZ, GARCIA, and two other subjects meet at the Twin Peaks restaurant in Pembroke Pines, FL. While inside, all subjects were overheard discussing the details of MONS' arrest. During the meeting, an undercover law enforcement officer heard ESPINOSA state, "The boxes we have coming in tomorrow should still be good. They shouldn't know about those." DEL PINO then stated, "We have to be smart about this, it isn't that hard."

23. Airline records revealed that DEL PINO, ROQUE-NUNEZ, SANCHEZ, MONS,

ESPINOSA, and GARCIA frequently travel between Florida and California. Officers conducted a historical analysis of all domestic air travel by these individuals between Florida and California/Nevada from May 1, 2018 to May 9, 2019. During that time, they took a combined 108 domestic flights on four different airlines, costing $76,551 in airfare. A Capital One credit card belonging to DEL PINO purchased 49 of those flights at a cost of $39,625.75. This particular credit card was used to purchase flights for DEL PINO, ROQUE-NUNEZ, ESPINOSA, SANCHEZ, and MONS.

24. Law enforcement personnel contacted the Florida Department of Revenue (FDR) to determine if any targets of investigation have any current or previous gainful employment. This query was conducted from January 2016 through March of 2019 and yielded the following results: DEL PINO, ROQUE-NUNEZ, and GARCIA had no employment information filed with the FDR; SANCHEZ earned a combined $44,229.34 from January 2016 through June 2017 and no employment information filed with the FDR from July 2017 through March 2019; ESPINOSA earned a combined $27,898.29 from January 2016 through December 2017 and no employment information filed with the FDR from January 2018 through March 2019; MONS earned a combined $19,298.07 from July 2016 through September 2018 and no employment information was filed with the FDR from October 2018 through March 2019.

25. Law enforcement officers identified several bank accounts belonging to DEL PINO, ROQUE-NUNEZ, ESPINOSA, GARCIA, and SANCHEZ. An analysis of those accounts revealed that between 2016 and 2018, $823,792.65 in cash deposits were made into several Bank of America, Chase, Citi, and TD Bank accounts in the name of DEL PINO. $423,888.60 in cash deposits were made into several Bank of America, Wells Fargo, and Chase accounts in the name of ROQUE-NUNEZ. $94,039.26 in cash deposits were made into a Chase account in the name of

ESPINOSA. $776,700.04 in cash deposits were made into several Chase, Citi, and TD Bank accounts owned by GARCIA. $145,802.13 in cash deposits were made into Bank of America and Chase accounts in the name of SANCHEZ. No bank account information has been identified at this time for MONS.

26. During the course of the investigation, your affiant learned that on July 19, 2017, Inspectors from the United States Postal Service (USPS) intercepted a parcel being shipped from a fictitious address in Miami, FL to a US Post Office box in Citrus Heights, CA. A BSO Narcotics Canine was deployed to the parcel and alerted for the presence of the odor of a controlled substance. The application for the postal box showed the postal box was opened by SANCHEZ and listed a phone number of (786) 357-9238. United States Postal Inspectors called SANCHEZ at this number and asked if he was expecting any parcels. SANCHEZ advised that he was not and gave consent to open the parcel. USPS Inspectors located $20,000 in cash concealed within the parcel. The currency was seized by USPS Inspectors.

27. On February 26, 2019, officers established surveillance on SANCHEZ' residence, 712 Bonneau Court, Patterson, CA. At approximately 12:40 p.m., they observed SANCHEZ exit his garage in a black KIA SUV. At approximately 12:58 p.m., SANCHEZ backed into a parking spot of the UPS Store located at 1045 Sperry Avenue, Patterson, CA. SANCHEZ carried a total of three large parcels inside of the store and later left the store empty-handed. One of the parcels was addressed to a UPS Store located in Doral, FL. The label listed the shipper as "Lazaro Hernandez." The other parcels were shipped to New Port Richey, FL. A search warrant was obtained for the Doral parcel, which contained approximately eight kilograms of marijuana.

28. On June 25, 2019, officers established surveillance SANCHEZ' residence. At approximately 4:49 p.m., ESPINOSA arrived at SANCHEZ' residence while driving a white

Chevrolet Suburban rental vehicle. GARCIA was following ESPINOSA and driving a gray Toyota Camry rental vehicle. SANCHEZ entered ESPINOSA's vehicle and both cars departed the residence. Both vehicles drove for approximately one hour and were observed entering a rural residence located in Delhi, CA. The area is known to local law enforcement officers for bulk narcotics trafficking. Due to counter-surveillance tactics utilized by ESPINOSA and GARCIA, surveillance was terminated.

29. On June 26, 2019, officers resumed surveillance at SANCHEZ' residence. At approximately 1:59 p.m., they observed SANCHEZ exiting his garage in a white Honda Accord. SANCHEZ parked in front of the UPS Store located at 1045 Sperry Avenue, Patterson, CA. SANCHEZ entered the business with a brown box in his possession. SANCHEZ later exited the store with only a white receipt in his hands. Officers learned the parcel was destined for an address in Hialeah, FL. The shipper's name was listed as "Lazaro Hernandez." Agents obtained a search warrant for the parcel. It was opened and contained approximately one kilogram of marijuana.

30. On September 11, 2019, BSO deputies encountered Espinosa at the Fort Lauderdale/Hollywood International Airport as he was attempting to board a flight to San Francisco, California. A narcotics canine alerted to Espinosa's luggage. A federal search warrant was obtained for the luggage which held, among other items, a laptop computer and $67,000 in U.S. currency. The laptop contained a backup copy of the contents of a cellular phone. In a February 6, 2019 text message exchange between Espinosa and an individual with initials R.A., Espinosa twice referenced having an Uzi firearm and questioned whether he should bring the firearm to a location where they planned to meet. The contents of the cell phone also included photos and videos depicting large amounts of U.S. currency, unidentified powdery substances, and what appear to be bulk quantities of marijuana.

31. On September 17, 2019, BSO deputies encountered Roque-Nunez at the Fort Lauderdale/Hollywood International Airport attempting to board a flight to San Francisco, CA. A narcotics K-9 alerted to Roque-Nunez' roller suitcase and his backpack. A federal search warrant was obtained for the bags which contained a laptop computer, $8,000 in U.S. currency, and one hundred money orders valued at $50,000. The money orders were purchased from 20 separate Publix grocery stores over an approximately twenty-four hour period. The money orders were blank with no persons listed to whom they should be paid.

32. Based on the foregoing facts, your Affiant believes there is probable cause that Christopher ESPINOSA, Luis Eduardo DEL PINO, Alon Justin GARCIA, Jonael MONS, Miguel ROQUE-NUNEZ, and Alex SANCHEZ conspired to distribute a controlled substance two wit: anabolic steroids and more than 50 kilograms of a mixture and substance containing a detectable amount of marijuana, in violation of Title 21, United States Code, Sections 841 and 846.

FURTHER YOUR AFFIANT SAYETH NOT.

James White, Task Force Officer
Homeland Security Investigations

Sworn to and subscribed before me
this **1ST** day of October, 2019.

PATRICK M. HUNT
UNITED STATE MAGISTRATE JUDGE